PETITION OF THE TRUSTEES OF THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY AND THE TRUSTEES OF THE PROVIDENCE, WARREN AND BRISTOL RAILROAD COMPANY FOR AUTHORITY TO DISCONTINUE ALL PASSENGER SERVICE ON THE LINE OF THE PROVIDENCE, WARREN AND BRISTOL RAILROAD COMPANY *vs.* DIVISION OF PUBLIC UTILITIES.

AUGUST 3, 1938.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

450

 

Moss, J. This is the appeal of Howard S. Palmer, James Lee Loomis and Henry B. Sawyer, trustees of the property of The New York, New Haven and Hartford Railroad Company, hereinafter referred to as the New Haven, and the same men as trustees of the property of The Providence, Warren and Bristol Railroad Company, hereinafter referred to as the P. W. & B., from an order of the division of public utilities of the state of Rhode Island, hereinafter referred to as the division, denying their petition to the division for authority to discontinue all passenger service on the lines of the P. W. & B.

That petition, filed on July 13, 1937, alleges that the passenger business on these lines is being operated by the trustees at a substantial loss and can only be operated at a loss, and that therefore the trustees should be authorized by the division to discontinue all such passenger business. Public hearings upon this petition were held in due course by the division after notice to all interested parties and persons, and a great deal of evidence was presented. Thereafter, on December 27, 1937, the division entered a decision describing the petition, discussing some of the evidence presented and ending with an order denying and dismissing the petition. Leave was, however, given for the filing with the division of "a new petition requesting the curtailment of certain trips during the off-peak hours." It is the petitioners' appeal, duly taken from this order, that is now before us.

The evidence taken at the hearings is before us. The following facts, among others, appear and are not in dispute.

The P. W. & B. was chartered by an act of the general assembly in 1850 and has continued in existence ever since. It constructed railroad tracks from the city of Providence through Warren to Bristol and began to operate a railroad service, for passengers and freight, over these tracks in July 1855. Afterwards a connecting line from Warren to the city of Fall River, Massachusetts, was constructed by the P. W. & B., which from April 1865 carried on also a passenger and freight business between that city and Providence, over the original line from Providence to Warren and the new line from Warren to Fall River.

In 1891 all the lines of the P. W. & B. were leased to the Old Colony Railroad Company, hereinafter referred to as the Old Colony, by a written lease for ninety-five years and nine months, which has continued in force until very recently terminated, as hereinafter stated. In 1893 the lines of the Old Colony, including the above lines of the P. W. & B., held under the lease just mentioned, were leased to the New Haven by a lease for ninety-nine years, by which the New Haven assumed the obligation of operating the railroad of the P. W. & B. "as required by all legal enactments from time to time in force." This lease also continued in force until very recently terminated. All service over the line between Warren and Fall River was discontinued in 1932, because the bridge over which the line entered the city of Fall River was so badly damaged that it could no longer be used; and such service has never been resumed. Service by the New Haven between Providence and Bristol has, however, continued until very recently, the tracks of the P. W. & B. being used, except that for some years all passenger trains, at least, have been operated between East Providence and Providence over tracks which have been controlled by the New Haven system and which pass on its bridge over the Seekonk river and through its tunnel to its central station in Providence.

On October 23, 1935, the New Haven filed, in the district court of the United States for the district of Connecticut, a petition for reorganization pursuant to section 77 of chapter VIII of the acts of congress relating to bankruptcy; and on the same day this petition was granted by that court. Trustees of the property of the New Haven were appointed by that court on November 8, 1935, and were authorized to continue the operation of its business. Later the court authorized the trustees to disaffirm leases to the New Haven. In accordance with this authorization the above-mentioned lease from the Old Colony to the New Haven was disaffirmed on June 2, 1936.

On the same day the Old Colony filed in the same court a petition for reorganization under the above-mentioned section of the acts of congress, and this was granted the next day; and the same persons were appointed as the trustees of the property of the Old Colony. On January 14, 1937, a petition by these trustees for authority to disaffirm the lease by the P. W. & B. to the Old Colony was granted by the court, and very soon afterwards that lease was disaffirmed accordingly.

On February 13, 1937, in like manner as the New Haven and the Old Colony had done, the P. W. & B. filed, in the same court and as a part of the same general proceedings, a petition for reorganization, in which it prayed that the trustees of the property of the New Haven be authorized and directed to operate the petitioner's property for the account of the petitioner. Later this petition was granted and the same persons were appointed trustees of the property of the P. W. & B. by an order of the court dated March 10, 1937. In this order it was provided that, inasmuch as the public interest and the interests of the P. W. & B. and of its security holders required that, until the further order of the court, its railroad lines and property "be operated as an integral part of the system of railroads" then being administered by the trustees of the property of the New Haven,

those trustees, as such trustees, were directed to continue to possess and operate the properties of the P. W. & B. *for its account* or that of the trustees of its property.

This they have been doing ever since, providing a passenger service between Providence and Bristol, with twelve daily round trips, at a very considerable loss, as the petitioners allege and have introduced evidence to prove, and providing also some freight service at a comparatively small loss, which they hope will be changed to a profit with the revival of general business. These losses are charged to the P. W. & B. Because of these alleged very heavy losses incurred in providing this passenger service and because of the great improbability, as alleged by them, that a passenger service can be provided on these lines without great losses, the petitioners filed, with the division of public utilities, the petition which is now before us on their appeal, for authority to discontinue entirely this passenger service.

By reason of facts above stated, it appears to us that the P. W. & B. now owns its own tracks and other railroad property, which are now free of any lease to or control by any other corporation, though subject to trustees appointed by a federal court in bankruptcy proceedings. It also appears to us that these trustees, by authority conferred on them by that court, and under the charter of the P. W. & B., granted by the general assembly of this state, are now operating the railroad lines and property of the P. W. & B., "as an integral part of the system of railroads now being administered by the trustees of the property" of the New Haven; but that such operation is *for the account* of the P. W. & B. The New Haven owns a majority of the common stock of the P. W. & B. which carries voting privileges, but that in our opinion is not a very important element in the problem now under consideration by us, especially as a substantial amount of this stock appears to be owned by members of the general public.

It appears that in carrying on this railroad business of the P. W. & B. and for its account, the trustees are making use also of tracks, between a certain point in East Providence and the central station in Providence, which are owned or controlled by the New Haven under the trustees of the property of the latter corporation, and are making use of some of the facilities of such station and of rolling stock and the like owned by the New Haven. But it appears to us that this use must be upon a basis which has been determined by the trustees, who, under the authority of the federal court, are in control of the properties of both of these corporations and upon which basis reasonable charges are being made to the P. W. & B. for such use.

We must bear in mind that if and when a reorganization is accomplished under the pending proceedings in the federal court, there is no assurance that the P. W. & B. and its properties or its properties alone, will be a part of the reorganized system, or that the New England Transportation Company, a subsidiary corporation, all the stock of which is owned by the New Haven and which is now operating a bus service between Providence and Bristol via Warren in competition with the passenger service of the P. W. & B. and roughly paralleling its tracks, will be a part of the reorganized system.

In this very complicated and doubtful situation, presented by all the pertinent facts above stated, a fundamental and rather difficult question is presented, which in our opinion is decisive of the issue raised by the first contention made by the attorney general in behalf of the division. This is that the division had no power to grant the petition involved in this case. This contention seems not to have been made until after the appeal reached this court. But as the contention is one as to the jurisdiction of the division over the subject-matter of this case, we are of the opinion that it may properly be raised here for the first time, and that we should dispose of it before discussing the merits of the ap-

peal on the assumption that the division had such jurisdiction.

The fundamental question above mentioned is as follows: Is this petition to be treated substantially as it should have been if the New Haven had filed it before the proceedings in bankruptcy were begun and while the intercorporate leases were in full force and if the New Haven had given satisfactory assurance that if it were allowed by the division to discontinue all its passenger service over the tracks of the .P. W. & B., it would furnish and continue to furnish a satisfactory and substantially equivalent service through the New England Transportation Company? Or is the petition to be treated as it would be if it were filed by the P. W. & B. as a separate corporation, operating a passenger and freight business over its lines and by virtue of its charter from the general assembly of this state?

It appears to us that we must adopt one or the other of the conflicting views of the fundamental nature of the petition which are incorporated in these two questions. After reviewing and weighing all the elements of the situation which have been presented to us in this case, we are of the opinion that the view set forth in the latter of the two questions should prevail over the other and that this question should be answered in the affirmative.

At the January session of the general assembly in 1855, an act was passed under the title: "An Act in relation to Railroad Corporations and the transportation of freight and passengers," and is found at page 13 of the Rhode Island Acts and Resolves for January of that year. The first sentence of sec. 2 of this act was as follows: "Every railroad company doing business, or owning any railroad, wholly or in part within the limits of this State, shall furnish reasonable and proper facilities and accommodations on the line of its road, within its limits, for the transportation of passengers and merchandise." With the exception of changing the above word "company" to "corporation" and changing the "z" to

"s" in "merchandize", this statutory requirement has been continued in force verbatim ever since, being included in every subsequent general revision of the laws.

Whether, by virtue of that statutory provision, the P. W. & B., as a railroad corporation organized and existing under a charter from this state and owning and controlling and operating a line of railroad in this state, could be *compelled* to continue to provide a passenger service over that line, even at a constant loss, so long as its charter continues in force, is a question on which very many arguments, written and oral, have been submitted to us in this case and very many cases cited. But that question need not and should not, under the existing circumstances, be decided by us, if we find that the division was without power to authorize the total discontinuance of passenger service by the P. W. & B. notwithstanding the above statutory provision and the continuance of freight business under its charter, and if we therefore find that the division did not commit error prejudicial to the appellants by denying their petition.

The division of public utilities, under provisions of the reorganization acts, so-called, public laws 1935, chap. 2188, and public laws 1935, chap. 2250, is the successor of the public utilities commission; and the powers and duties of that commission were transferred to that division. The commission was created and its powers and duties were defined by the general assembly in public laws 1912, chap. 795. Section 55 of that act contained the following provision: "All the powers and duties conferred by law upon and required to be performed by the railroad commissioner or his deputy at the time of the passage of this act shall hereafter devolve upon and be exercised and performed by the public utilities commission."

These powers and duties of the railroad commissioner and his deputy were defined by general laws 1909, chap. 215, which was in effect at the time of the enactment of public laws 1912, chap. 795. The legislation defining the

powers and duties of the public utilities commission was reenacted in general laws 1923, chap. 253, which contains a sec. 54, which is substantially the same as public laws 1912, chap. 795, sec. 55, above quoted.

We have examined and considered the statutes above mentioned and the amendments thereto and are of the opinion that, while very large powers of regulation of railroads and other public utilities have been and are vested in the division of public utilities, no power has been vested in the division broad enough to include the power to authorize a separate railroad corporation, operating, under a charter granted by the general assembly of this state, a railroad business in this state over its own lines and furnishing a passenger and freight service, of which the passenger service is an important part, to discontinue entirely its passenger service.

This, in our opinion, would be going outside the field of regulation. We have no substantial doubt that under the power of regulation given it, it may, within reasonable limits, permit the discontinuance of stops at certain stations, at which there is no demand for service or very little demand for it, or that under like circumstances it may permit the discontinuance of certain trains run at certain times of the day, if trains continue to be operated at the times of day when there is a substantial demand for them. But authorizing the entire discontinuance of passenger service over all the lines of a railroad corporation is a very different matter, when there is a substantial demand for such service, and especially when the furnishing of a substantially equivalent service by the same corporation or by another passenger transportation corporation which is completely under its control is not assured.

If the division, by making and enforcing an order, should undertake to *compel* a railroad corporation to furnish a certain service, which can only be furnished at a substantial and continuing loss, there might then be a serious

question whether the division could do so; and the many legal authorities cited by the appellants and by the appellee on that question would then require consideration. But it is our opinion that their consideration is not required now.

On the question of the power of the division to authorize a railroad corporation to discontinue passenger serice entirely over a certain line, the attorneys for the petitioners cite in their reply brief a considerable number of instances, in which, they contend, the public utilities commission exercised that power. But all but two of these seem to us to be clearly instances of the exercise of the commission's conceded power to regulate, in which the New Haven was permitted to discontinue its passenger service over a small section of its tracks upon the substitution therefor of a substantially equivalent service by a subsidiary corporation wholly dominated by it and forming a part of the New Haven system.

A typical instance of this sort, which is presented by the petitioners for our consideration, is that which is set forth in the commission's report to the general assembly for the year 1933, at page 250 *et seq.* The report shows that in that instance the commission, for a trial period, permitted passenger service by busses operated over the highways by the New England Transportation company, which is a wholly owned subsidiary of the New Haven, to be substituted for gas-electric-rail passenger service by the New Haven itself between the city of Providence and the village of Washington, Rhode Island. The petition which was granted was described thus in the report: "This is a petition of The New England Transportation Company for an amendment to its certificate number I-232, Providence-Norwich operation, to permit the operation of an alternate route under this certificate in conjunction with the route now operated, because of the fact that the New York, New Haven and Hartford Railroad Company proposes to

substitute bus service in place of train service between Providence, Rhode Island and Washington, Rhode Island."

The other instances cited and described by the appellant are of the same character except the two above mentioned. One of these two was the granting by the commission in 1931 of a petition which had been filed by the Rhode Island Motor Transportation Company, operating a jitney service, for permission to file a new schedule of reduced rates for weekly commuters and school children, and which recited that the New Haven would abandon its passenger service on its Providence-Pascoag branch on January 4, 1932. This instance may have been of the same character as the others above mentioned. But even if it was not, we cannot see that it supports the present contention of the appellants.

The only other instance which the appellants cite as showing the exercise by the commission of a power such as that which they have in the present case asked the division to exercise is that of the petition of The Moshassuck Valley Railroad Company to the commission for authorization to discontinue that company's passenger service. This was filed in 1921 and was granted by the commission, as shown by the commission's report for 1921, at pages 73 and 74. This may have been an instance of the exercise of the power which the appellants claim is possessed by the division. But there is nothing to show that it was; and even if it was, we are of the opinion that it is not enough to prove that the division has that power.

Apparently the petition was not contested and the question of the power of the commission was not raised. A considerable series of exercises of such power by the commission, without action being taken by the general assembly to prevent further exercises of it, might well give some support to a contention that doubtful language in the statute defining the powers of the commission should be construed, if it reasonably could be, as conferring such

power on the commission. See *Providence* v. *Hall,* 49 R. I. 230. But we find no such doubtful language; and one instance of the exercise of the power by the commission would not support such a contention, anyway.

On the other hand, as called to our attention in the brief for the division in the instant case, the general assembly by public laws 1920, chap. 2000, sec. 3, expressly vested the commission "with power to authorize the Narragansett Pier Railroad Company to reduce service on, or discontinue the operation of the Narragansett Pier Railroad Company, or any part thereof, owned or operated by said company, where the revenue received from the operation of such line or part thereof does not, in the judgment of the public utilities commission, justify the continuance of such service or operation."

That no such power is to be held to be possessed by a public utilities commission, unless expressly conferred in the legislative act defining the powers and duties of the commission, or by fairly implied inferences from its language, was held in 1925 by the supreme court of New Hampshire in *Petition of Boston & Maine R. R. Co.,* 82 N. H. 116, 129 A. 880. The court in its opinion in that case says: "The establishment of such an agency is of a special rather than general character, and power and authority not granted are withheld."

After referring to language in a legislative enactment which conferred on the commission regulatory power over the service of railroads, the court further says: "If it be assumed that general regulatory authority over service was thereby granted as fairly within the intendment of the act, so as to include the authority to permit limitations and lessening of service, as adequate for a limited or lessened public demand, yet regulation is not inclusive of cessation or suspension of service."

It is our opinion that the powers possessed by the division of public utilities of this state are not broad enough

to include the power to grant the petition which is involved in the appeal now before us. We therefore must sustain the order of the division denying and dismissing that petition.

The appeal is denied and dismissed and the order appealed from is sustained.

*Eugene J. McElroy, Marshall Swan, Eugene J. Phillips, Swan, Keeney & Smith,* for trustees.

*John P. Hartigan,* Attorney General, *John J. Cooney, Assistant Attorney General,* for Division of Public Utilities.

*Lester S. Walling,* Town Solicitor for town of Barrington.

*Joseph A. Hammill,* Town Solicitor for town of Bristol.

*William C. H. Brand,* Town Solicitor for the town of East Providence.

*William H. McSoley,* Town Solicitor for the town of Warren.